# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2014AP2431 |
| COMPLETE TITLE: | In re the termination of parental rights to Matthew D., a person under the age of 18: |
| | |
| | St. Croix County Department of Health and Human Services, |
| | Petitioner-Respondent-Petitioner, |
| | v. |
| | Michael D., |
| | Respondent, |
| | Juanita A., |
| | Respondent-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 360 Wis. 2d 492, 864 N.W.2d 121)
(Ct. App. 2015 – Unpublished)

| | |
|---|---|
| OPINION FILED: | May 12, 2016 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 17, 2015 |
| | |
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | St. Croix |
| JUDGE: | Edward F. Vlack, III |
| | |
| JUSTICES: | |
| CONCURRED: | ROGGENSACK, C. J. concurs, joined by BRADLEY, R. G., J. |
| | PROSSER, J. concurs |
| | BRADLEY, R. G., J. concurs |
| DISSENTED: | ABRAHAMSON, J. and BRADLEY, A. W., J. dissent (co-authored) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the petitioner-respondent-petitioner, there were briefs by *Steven L. Miller and St. Croix Department of Health and Human Services,* and oral argument by *Steven L. Miller.*

For the respondent-appellant, there was a brief by *Susan E. Alesia,* assistant state public defender*,* and oral argument by *Susan E. Alesia.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2014AP2431
(L.C. No. 2013TP10)

STATE OF WISCONSIN           :        IN SUPREME COURT

**In re the termination of parental rights to Matthew D., a person under the age of 18:**

**St. Croix County Department of Health and Human Services,**

        **Petitioner-Respondent-Petitioner,**

**FILED**

  **v.**

**MAY 12, 2016**

**Michael D.,**

Diane M. Fremgen
Clerk of Supreme Court

        **Respondent,**

**Juanita A.,**

        **Respondent-Appellant.**

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 REBECCA G. BRADLEY, J. The issues before us arise from St. Croix County's petition to terminate Juanita A.'s parental rights to her son, Matthew D., born March 23, 2009. The petition alleges both that Matthew was a child in continuing need of protection or services ("continuing CHIPS"), under Wis.

Stat. § 48.415(2)(2013-14),[1] and that Juanita failed to assume parental responsibility, under Wis. Stat. § 48.415(6).[2] We must determine whether Juanita received proper notice under § 48.415(2), and, if so, whether sufficient evidence supports the remaining elements of the continuing CHIPS ground for termination. The notice issue requires us to clarify whether <u>Waukesha County v. Steven H.</u>, 2000 WI 28, 233 Wis. 2d 344, 607 N.W.2d 607, created an unequivocal rule that the statutorily prescribed written notice must be given in the <u>last</u> order placing a child outside his or her home and whether six months must pass <u>after</u> that last order before filing a termination of parental rights ("TPR") petition.

¶2 We hold that the notice Juanita received satisfied the statutory notice requirement in a TPR action based on continuing CHIPS, and that the evidence was sufficient to support the remaining elements of continuing CHIPS set forth in Wis. Stat. § 48.415(2). We further hold that <u>Steven H.</u> did not establish a "last order, plus six-months rule"; rather, <u>Steven H.</u> emphasized that parents facing termination of parental rights based on continuing CHIPS must have received written notice in <u>one or</u>

---

[1] All references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated. We cite to the most recent version of the statutes because no pertinent changes have been made.

[2] St. Croix County's termination of parental rights petition also included Matthew's father, Michael D., but Michael D. did not contest the petition.

more court orders warning them that termination may occur. In Steven H., the last order contained the written notice; therefore, based on the facts in that particular case, the written notice required by § 48.415(2) was satisfied by the last order.

¶3 In adhering to the important principle of stare decisis, we do not overrule Steven H. Rather, we acknowledge that two sentences in that case directly contradict the plain language of Wis. Stat. § 48.415(2). As a result, our circuit and appellate courts have issued inconsistent decisions when addressing factual scenarios such as the one presented here where the last order does not comply with the statutory notice requirements, but the circuit court finds another order did comply and the parent was adequately warned that parental rights were at stake and how to prevent a termination of those rights. Since Steven H., circuit courts have had to decide whether to follow the plain statutory language when a parent did not receive notice in the last order or follow the two sentences in Steven H. that conflict with the court's extensive discussion of the legislative purpose of Wis. Stats. §§ 48.356(2) and 48.415(2)——to provide adequate notice to parents. Our opinion clarifies Steven H. so that our circuit courts are able to consistently apply the plain language of the statute, and ensure that parents facing termination of their parental rights receive the notice required by Wis. Stat. § 48.415(2) without delaying a very important purpose of these statutes——permanency for the child.

3

¶4 Accordingly, we clarify Steven H., leaving intact its analysis and discussion; however, the conflicting sentence in paragraph 3 is withdrawn[3] and we clarify that the last sentence in paragraph 31 shall not be construed to create a last order, six-months rule. The language in the last sentence in paragraph 31 is limited to the facts of Steven H. where only the last order contained the written notice and the child had been out of the home for six months or longer.[4] The plain language of § 48.415(2) does not require that the written notice must be in the last order or that six months must pass after the last order before the petition to terminate parental rights may be filed. Accordingly, we reverse the court of appeals' decision[5] and affirm the circuit court's order[6] terminating Juanita's parental rights to Matthew.

---

[3] We withdraw this sentence: "We conclude that Wis. Stat. §§ 48.356(2) and 48.415(2) require that the last order specified in § 48.356(2) placing a child outside the home, which must be issued at least six months before the filing of the petition to terminate parental rights, must contain the written notice prescribed by § 48.356(2)." Waukesha Cnty. v. Steven H., 2000 WI 28, ¶3, 233 Wis. 2d 344, 607 N.W.2d 607.

[4] The last sentence in paragraph 31 of Steven H. states: "Under § 48.415(2) the parents will be given adequate notice of the conditions for return and time to make any necessary changes to forestall the termination of parental rights if the last order issued at least six months before the filing of the petition involuntarily terminating parental rights contains the written notice." Steven H., 233 Wis. 2d 344, ¶31.

[5] St. Croix Cnty. DHHS v. Michael D., No. 2014AP2431, unpublished slip op. (Wis. Ct. App. Jan. 16, 2015).

[6] The Honorable Edward F. Vlack presiding.

I.   BACKGROUND

¶5   Juanita has physical, cognitive and mental health challenges.   When Matthew was born on March 23, 2009, Juanita had two other sons in her home, 12-year-old John, who is autistic, and 3-year-old Henry, who was removed from Juanita's home in May 2009 because Juanita was unable to properly supervise and maintain reasonable control over Henry.   Juanita's parental rights to Henry were terminated in May 2012.   When Matthew was eight days old, he was removed from Juanita's home based on reports that Matthew's two older brothers had dropped him, shaken him, and were not properly supporting his head when holding him.   Matthew was returned to Juanita at the end of May 2009.

¶6   In June 2009, the circuit court found Matthew to be a child in need of protection or services following an incident where police were called to Juanita's home and found Matthew struggling to breathe.   Juanita told police Matthew had not taken a breath for a minute and his lips turned blue, but she did not want to call 911 for a "little problem like that." Matthew was taken to the hospital for treatment. He recovered and remained in Juanita's care subject to certain conditions and with support and services in place to assist her.   The circuit court extended this in-home placement continuing CHIPS order several times.   At the end of July 2011, when Matthew was almost two and one-half years old, he was again removed from Juanita's home, based on concerns that Juanita could not properly care for

5

him and that her inability to adequately supervise Matthew put him in danger.

¶7   In August 2011, the circuit court issued a written CHIPS order changing Matthew's placement from Juanita's home to a foster home.  At a court hearing on October 5, 2011, where Juanita appeared with her lawyer, the circuit court read the TPR warnings to Juanita, and on October 11, 2011, the court issued a dispositional order amending the August order and attaching the conditions Juanita was required to meet before Matthew could be returned to her home.  This October 11 order also had attached a "Notice Concerning Grounds to Terminate Parental Rights" that Juanita had signed.  Under Wis. Stat. § 48.356, whenever the court orders a child to be placed outside the home because the child has been found to be in need of protection or services, the court must orally inform the parent—if present in court—of any applicable grounds for termination of parental rights and the conditions necessary for the child to be returned to the home.  Additionally, any written order placing a child outside the home, or extending the out-of-home placement, must contain this information.

¶8   Juanita returned to the circuit court on December 12, 2011, where the court again gave oral TPR warnings to Juanita and ordered an extension of the October 11 dispositional order. The extension contained a provision notifying Juanita that: "All conditions of the dispositional order/consent decree remain in effect," but the court did not attach the separate TPR warnings.  Juanita appeared for another hearing on September 6,

6

2012, where the circuit court again gave her oral TPR warnings. On September 11, 2012, the circuit court issued another extension order, which contained the same language noted above: "All conditions of the dispositional order/consent decree remain in effect" but it did not attach separate TPR warnings.

¶9 St. Croix County first filed a TPR petition as to Matthew in January of 2013, but it was dismissed without prejudice on June 12, 2013 because the prosecutor inadvertently failed to appear for the pre-trial hearing. On June 18, 2013, St. Croix County filed a second TPR petition seeking to terminate Juanita's parental rights based on continuing CHIPS under Wis. Stat. § 48.415(2), and failure to assume parental responsibility under Wis. Stat. § 48.415(6). On September 4, 2013, the circuit court issued another extension order, which contained the same language noted above: "All conditions of the dispositional order/consent decree remain in effect" but it did not attach separate TPR warnings.[7]

---

[7] In her brief, Juanita emphasizes the numerous written orders in this case: "There were 27 written orders in Matthew's CHIPS case[.]" We note that only 4 of the 27 written orders were CHIPS orders requiring written notice under Wis. Stat. § 48.356(2). Juanita also emphasizes that there were ten CHIPS court hearings in this case. We note that seven of those ten hearings required oral TPR warnings under Wis. Stat. § 48.356(1). Juanita received oral warnings at three of the seven hearings. The deficiencies of these notices and warnings under § 48.356 in Matthew's CHIPS case do not affect our holding that Juanita received sufficient notice in this TPR case because the TPR statute based on continuing CHIPS grounds requires proof only that the written notice under § 48.356(2) be given in one or more of the CHIPS orders.

7

¶10 The fact-finding hearing, tried to the court, occurred in December 2013. After St. Croix County presented its case, Juanita moved the circuit court to dismiss the TPR petition, arguing failure of proof on the elements and inadequate notice contrary to Wis. Stat. § 48.415(2) and Wis. Stat. § 48.356. The circuit court denied both motions. With respect to the notice issue, the circuit court ultimately ruled Steven H. did not establish an unequivocal "last order, plus six-months rule." Instead, it held that "substantial compliance" with the notice statute was sufficient. It reached this conclusion based on Steven H.'s emphasis on the legislative purpose of the Children's Code, the court of appeals' interpretation of Steven H. in Waushara County v. Lisa K., 2000 WI App 145, 237 Wis. 2d 830, 615 N.W.2d 204, and Steven H.'s discussion that the purpose of the notice statutes "is meant to ensure that a parent has adequate notice of the conditions with which the parent must comply for a child to be returned to the home. The notice is also meant to forewarn parents that their parental rights are in jeopardy." Steven H., 233 Wis. 2d 344, ¶37. The circuit court then found the notice given to Juanita sufficient to comply with the statutes:

> [Notice to Juanita] was sufficient under § 48.356(2) to inform her that her parental rights were in danger of being terminated and advising her of the conditions necessary for the return of the child. Although only one TPR warning was written, this Court finds it is not fatal that the 2012 extension order did not contain written TPR warnings. From the date of the October 5, 2011, extension hearing, [Juanita] appeared before the court, with counsel, on at least ten

8

different occasions related to this matter. She was given a written TPR warning on October [11], 2011, and given oral TPR warnings on three occasions including: October 5, 2011, December 12, 2011, and September 6, 2012. Less than five months after the September 6, 2012, TPR warnings were given, the first [TPR] Petition . . . was filed. The current [TPR] Petition . . . was filed less than one year after the September 6, 2012, hearing. The number and frequency of the court proceedings, in addition to four occasions since October 5, 2011, [Juanita] was orally given TPR warnings, lead this Court to conclude that she had sufficient notice under § 48.356(2). [Juanita] had notice of the conditions required of her for the child to return to her care and that her legal rights were in jeopardy if she did not meet those conditions.

¶11 Further, the circuit court rejected Juanita's claim that she was "confused" about whether termination was looming:

This Court has noted the number and frequency of the [CHIPS] proceedings . . . as well as the number of warnings, both oral and written, she was given in the two years prior to the filing of the current Petition. In addition, she has had full representation throughout [the CHIPS proceedings] and these present proceedings, and has not raised, through counsel or personally, any issue of confusion with regard to the obligations, conditions, or consequences until now.

¶12 The circuit court found grounds existed on the continuing CHIPS allegation, but that St. Croix County failed to prove Juanita had not assumed parental responsibility for Matthew. The circuit court found Juanita unfit to parent Matthew and the case proceeded to a dispositional hearing. At the conclusion of the dispositional hearing, the circuit court found it was in Matthew's best interests to terminate Juanita's parental rights. The circuit court entered the order terminating Juanita's parental rights in May 2014.

9

¶13 Juanita appealed to the court of appeals, which reversed the circuit court and remanded "for vacation of the termination order and dismissal of the termination of rights petition." St. Croix Cnty. DHHS v. Michael D., No. 2014AP2431, unpublished slip op., ¶1 (Wis. Ct. App. Jan. 16, 2015). Citing Steven H., the court of appeals ruled that because the last order Juanita received did not contain written notice warning her about termination, St. Croix County failed to establish the notice element required under Wis. Stat. § 48.415(2)(a)1. St. Croix Cnty. DHHS v. Michael D., No. 2014AP2431, unpublished slip op., ¶16 (Wis. Ct. App. Jan. 16, 2015).

## II. ANALYSIS

¶14 This appeal involves issues relating to the involuntary termination of parental rights, under Chapter 48 of the Wisconsin Statutes, the Children's Code. Wisconsin Stat. § 48.417 requires the authorized agency to file a petition to terminate parental rights under certain circumstances including when: "[t]he child has been placed outside of his or her home . . . for 15 of the most recent 22 months" and "the petition shall be filed . . . by the last day of the 15th month . . . the child was placed outside of his or her home." Wis. Stat. § 48.417(1)(a). Wisconsin Stat. § 48.415 sets forth the grounds for termination, including "Continuing need of protection or services," which provides in relevant part:

> **Grounds for involuntary termination of parental rights.** At the fact-finding hearing the court or jury shall determine whether grounds exist for the termination of parental rights. . . . Grounds for

10

termination of parental rights shall be one of the following:

. . .

(2) Continuing need of protection or services. Continuing need of protection or services, which shall be established by proving any of the following:

(a) 1. That the child has been adjudged to be a child or an unborn child in need of protection or services and placed, or continued in a placement, outside his or her home pursuant to one or more court orders under s. 48.345, 48.347, 48.357, 48.363, 48.365, 938.345, 938.357, 938.363 or 938.365 containing the notice required by s. 48.356 (2) or 938.356 (2).

2. a. In this subdivision, "reasonable effort" means an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child or of the expectant mother or child, the level of cooperation of the parent or expectant mother and other relevant circumstances of the case.

b. That the agency responsible for the care of the child and the family or of the unborn child and expectant mother has made a reasonable effort to provide the services ordered by the court.

3. That the child has been outside the home for a cumulative total period of 6 months or longer pursuant to such orders not including time spent outside the home as an unborn child; and that the parent has failed to meet the conditions established for the safe return of the child to the home and there is a substantial likelihood that the parent will not meet these conditions within the 9-month period following the fact-finding hearing under s. 48.424.

Wis. Stat. § 48.415(2)(a)1.-3.

## A. Notice

¶15 The first issue is whether the written notice requirements under Wis. Stat. § 48.415(2)(a)1. were satisfied.

11

This issue requires statutory interpretation, which is a question of law that we review de novo. Shannon E.T. v. Alicia M. V.M., 2007 WI 29, ¶31, 299 Wis. 2d 601, 728 N.W.2d 636. Our standards for interpreting statutes are well-known and need not be repeated here. See State ex re. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110.

¶16 The language of Wis. Stat § 48.415(2)(a)1. requires St. Croix County to prove Matthew "has been adjudged to be a child . . . in need of protection or services and placed, or continued in a placement, outside his or her home pursuant to one or more court orders . . . containing the notice required by s. 48.356(2)." (Emphasis added.) Wisconsin Stat. § 48.356 requires the circuit court to give oral and written warnings to parents whose children are placed outside their home "of any grounds for termination of parental rights under s. 48.415 which may be applicable." Section 48.356 provides in full:

> **Duty of Court to Warn.** (1) Whenever the court orders a child to be placed outside his or her home, orders an expectant mother of an unborn child to be placed outside of her home, or denies a parent visitation because the child or unborn child has been adjudged to be in need of protection or services under s. 48.345, 48.347, 48.357, 48.363, or 48.365 and whenever the court reviews a permanency plan under s. 48.38(5m), the court shall orally inform the parent or parents who appear in court or the expectant mother who appears in court of any grounds for termination of parental rights under s. 48.415 which may be applicable and of the conditions necessary for the child or expectant mother to be returned to the home or for the parent to be granted visitation.
>
> (2) In addition to the notice required under sub. (1), any written order which places a child or an expectant

12

> mother outside the home or denies visitation under sub. (1) shall notify the parent or parents or expectant mother of the information specified under sub. (1).

Subsection (1) sets forth the required oral warnings and subsection (2) sets forth the required written warnings. Only subsection (2) is referenced in the TPR based on continuing CHIPS statute.

¶17 We begin by emphasizing that this is a TPR case, not a CHIPS case. Therefore, the case is governed by Wis. Stat. § 48.415(2)——a TPR statute. Section 48.415(2) makes the written notice in the CHIPS statute, Wis. Stat. § 48.356(2), an element to prove in a TPR case grounded in continuing CHIPS to ensure that a parent whose rights are being terminated has——at least one time——received written notice to that effect. The language of the TPR statute does not specifically mention the last order, the first order or use the term every order. Rather, it references one or more of the court's written orders notifying a parent of applicable grounds for termination of parental rights.[8] We are not at liberty to disregard the plain

---

[8] We are confident that applying the plain language of Wis. Stat. § 48.415(2) will not result in our circuit courts ignoring the notice requirement in CHIPS cases under Wis. Stat. § 48.356. Based on Wis. Stat. § 48.356(2)'s requirement that "any written order which places a child . . . outside the home . . . shall notify the parent or parents" of potential TPR grounds and conditions necessary for a child to be returned to the home, parental rights and notice requirements will not be diluted by our decision in this case.

words of the statute and we will not attempt to improve the statute by adding words not chosen by the legislature. It is undisputed that the October 11, 2011 written order contains the statutorily prescribed termination of parental rights warnings. Thus, the statutory requirement was satisfied in this case because one order——the October 11, 2011 order——included the written TPR notice warning Juanita that her parental rights to Matthew were in jeopardy.

¶18 We could end our analysis here but for the fact that Steven H. has created a question in the court of appeals and circuit courts as to whether Steven H. created a bright-line rule requiring that the last order in a CHIPS case contain the written notice in order to satisfy Wis. Stat. § 48.415(2)(a)1. Courts, including the circuit court in the instant case, are ruling different ways on this question. As we have seen here, this circuit court, faced with the factual scenario where a parent had adequate notice despite the last order not containing the Wis. Stat. § 48.356(2) warnings, concluded the elements for termination based on continuing CHIPS were satisfied because one order had the written warnings attached. This circuit court, faced with a choice between the plain language of Wis. Stat. § 48.415(2) requiring only one order and two conflicting sentences in Steven H. about the last order, chose to apply the plain language of the statute.

¶19 The court of appeals, in Lisa K., 237 Wis. 2d 830, ¶13 reached a similar conclusion. In Lisa K., the last extension order before the TPR filing did not contain the notice required

14

by Wis. Stat. § 48.356(2), but the previous dispositional orders contained the requisite notice. Lisa K., 237 Wis. 2d 830, ¶2. After discussing Steven H., the court of appeals rejected Lisa K.'s argument that Steven H. created a last order, six-months rule. Id., ¶¶5-6. Rather, the court of appeals held that "notice and adequate information were the dispositive factors in CHIPS notices which are followed by termination of parental rights proceedings," id., ¶8, and therefore, as long as a parent "had more than adequate notice of what was expected of her for the return of her children to her, and was more than adequately forewarned that her parental rights were in jeopardy . . . it is not relevant . . . that the final order . . . did not contain" all the notice requirements of § 48.356(2). Lisa K., 237 Wis. 2d 830, ¶10.

¶20 Additional cases demonstrate the factual variations that arise in TPR cases and how the courts have reached differing decisions based on Steven H. See State v. Amelia A., Nos. 2015AP630-31, unpublished slip op., ¶¶1-2 (Wis. Ct. App. June 9, 2015)(affirming termination of parental rights where August 2012 order contained statutory notices but August 2013 order did not; held that because TPR petition was filed in November 2013, which was less than six months after August 2013 order, August 2012 order controls decision); Portage Cnty. DHHS v. Julie G., No. 2014AP1057, unpublished slip op., ¶¶20-21 (acknowledging Steven H. last order, six-months rule); Walworth Cnty. DHHS v. Jeanna R., No. 2009AP1952, unpublished slip op., ¶17 (Wis. Ct. App. Nov. 11, 2009)(same); Dunn Cnty. DHSS v.

15

Debra O., Nos 2008AP17715077, unpublished slip op., ¶15 (Wis. Ct. App. Jan. 9, 2009)(citing Steven H. for the proposition "we recognize it may not be necessary in every TPR case to demonstrate that the parent was provided the requisite notice of conditions in every single order, as long as the parent had adequate notice given the facts of the case."); Pierce Cnty. v. Amy F., No. 2004AP1552, unpublished slip op., ¶¶7-10 (Wis. Ct. App. Aug. 31, 2004)(where parent received required notice with first CHIPS order, Steven H. does not support her claim that failure to receive the last order with identical warnings as the first order requires dismissal); see also Comment, Wis JI—Children 324A ("The Committee believes that Wis. Stat. § 48.415(2) requires only that the last order placing the child/children outside the home contain the written warnings regarding the termination of parental rights.").

¶21 Thus, some courts read Steven H. to say the statutory notice must be in the last order filed six months before the TPR. Others read Steven H. to say as long as the parent has adequate notice of the conditions required for return of the child and sufficient warning that parental rights are in jeopardy, the last order need not contain the notices required in Wis. Stat. § 48.356(2). As a result, some courts are not following the plain language of the statute, which requires that to prove continuing CHIPS as a TPR ground, the State must prove the parent received "one or more" orders containing the required notice.

16

¶22 Today, we clarify our decision in Steven H. The issue in Steven H. as it relates to the present case was whether Wis. Stat. §§ 48.415(2) and 48.356(2), in a TPR case based on the continuing CHIPS ground, "require that each and every order placing a child outside his or her home contain the written notice prescribed by § 48.356(2) in order for the termination of parental rights to proceed." Steven H., 233 Wis. 2d 344, ¶2, ¶16. The answer to that question was and remains no. We reached that answer by applying the language of both statutes, cognizant of the legislative purposes expressed in the Children's Code. We noted the legislature used "one or more court orders" in § 48.415(2) but "any order" in § 48.356(2). We examined in depth the expressed legislative purposes set forth in the Children's Code in Wis. Stat. § 48.01(1), which directs "that courts act in the best interests of a child, that courts avoid impermanence in family relations and that courts eliminate the need for children to wait unreasonable periods of time for their parents to correct the conditions that prevent their return to the family." Steven H., 233 Wis. 2d 344, ¶36. Based on these considerations, we held that even though Steven H. received the statutorily prescribed notice in only one written order (the last order before the TPR petition was filed), this satisfied the statutes because the notice served its dual purpose of (1) "ensur[ing] that a parent has adequate notice of the conditions with which the parent must comply for a child to be returned to the home"; and (2) "forewarn[ing] parents that their parental rights are in jeopardy." Id., ¶37.

17

¶23 We explained in Steven H. that interpreting the different terminology in Wis. Stat. § 48.415(2) ("one or more court orders") and Wis. Stat. § 48.356(2)("any order") as the appellant parent requested would frustrate the important goals of the Children's Code:

> If the court interprets the statutes as Steven H. requests, [the child] would likely remain in the impermanence of foster care for many more months until the alleged defects in [the deficient orders] could be cured. This interpretation is not required by the words of Wis. Stat. § 48.356(2) and Wis. Stat. § 48.415(2). Furthermore, this interpretation is contrary to the express legislative policy of the Children's Code that courts act in the best interests of a child, that courts avoid impermanence in family relations and that courts eliminate the need for children to wait unreasonable periods of time for their parents to correct the conditions that prevent their return to the family. Wis. Stat. § 48.01(1)(a).

Steven H., 233 Wis. 2d 344, ¶36. As the circuit court here observed, this case has been pending since April 2009. Dismissing the petition because the last order did not have the requisite warnings despite compliance with the "one or more" language of the TPR statute, runs contrary to the purpose of the Children's Code. It also would cause us to reject and abandon the extensive and thoughtful analysis in Steven H. about the purposes for the Children's Code, which resulted in the Steven H. holding: "that Wis. Stat. § 48.356(2) and 48.415(2) do not require that each and every order removing a child from his or her home contain the written notice prescribed by § 48.356(2) in order for the termination of parental rights to proceed." Steven H., 233 Wis. 2d 344, ¶3.

18

¶24 The plain language of § 48.415(2) requires that in a TPR case where the underlying ground to terminate is based on continuing CHIPS, the statutory notice requirements are satisfied when at least <u>one</u> of the CHIPS orders contains the written notice required under § 48.356(2). In <u>Steven H.</u>, the <u>last</u> order satisfied this requirement. In Juanita's case, the October 11, 2011 order satisfied this requirement.[9] Accordingly, we make clear today that <u>Steven H.</u> did not create a bright-line "last order, six-months" rule and we withdraw the language in <u>Steven H.</u> creating that suggestion. See <u>supra</u> nn.3-4.

¶25 Although bright-line rules are helpful in practice, we cannot change the language of this statute, but must apply the statutory words chosen by the legislature. The language of Wis. Stat. § 48.415(2) is not ambiguous; it is very clear——only <u>one</u>

---

[9] We also note that in addition to the one written notice, Juanita also received three oral warnings from the circuit court at three separate hearings: October 5, 2011, December 12, 2011, and September 6, 2012 (which was less than five months before the first petition to terminate was filed). Further, Juanita had just a few months earlier gone through a separate TPR for her other son, Henry, where her parental rights were terminated; moreover, Juanita was represented by counsel throughout all proceedings. The circuit court made a specific factual finding that despite the non-compliant September 11, 2012 order, Juanita did in fact receive sufficient notice and understood both the conditions necessary for return and the consequences for failing to meet those conditions. The record demonstrates Juanita had adequate notice that her parental rights to Matthew were in jeopardy.

Further, we are not persuaded by Juanita's contention she was confused. The circuit court found that Juanita was not confused, and we see nothing to suggest that finding was clearly erroneous.

19

or more of the written notices required under Wis. Stat. § 48.356(2) must be proven in a TPR case based on continuing CHIPS. The legislature does not explain why it used "one or more" in the TPR statute, but used "any" in the CHIPS statute. This does not, however, change our analysis. The legislature used "one or more" in § 48.415(2) and that is the language we must apply in this TPR case.

¶26 Our holding does not alter the statutory duty of the circuit court in CHIPS proceedings under Wis. Stat. § 48.356, whenever the court orders a child to be placed outside his or her home, to (1) orally warn parents who appear in court of any grounds for termination of parental rights which may be applicable and (2) include written notice of such grounds in any written orders for such out-of-home placement. These procedures effectuate another express legislative purpose set forth in Wis. Stat. § 48.01(ad) of assuring that parents' "constitutional and other legal rights are recognized and enforced." However, the legislature has not incorporated these mandates into the elements necessary to prove a continuing CHIPS ground in a TPR action under Wis. Stat. § 48.415(2). Accordingly, under a plain reading of the text of § 48.415, a TPR action based on allegations of continuing CHIPS is not precluded solely by noncompliance with § 48.356 in CHIPS proceedings, provided the elements of continuing CHIPS are proven.

¶27 Although Juanita's case does not involve an issue as to the six-months rule referenced in Steven H., we address it for clarity. Wisconsin Stat. § 48.415(2) does not say the

20

agency seeking a TPR must wait to file until six months after the last CHIPS dispositional order or extension thereof; rather, § 48.415(2)'s only reference to six months comes in Wis. Stat. § 48.415(2)(a)3., which provides that the agency seeking termination must prove: "That the child has been outside the home for a cumulative total period of 6 months or longer pursuant to such orders." There is no language stating the "6 months" must be <u>after</u> the last CHIPS dispositional order or extension; rather, the "6 months" is a "cumulative total period" under the CHIPS orders. Any other interpretation would require reading language into the statute that does not exist and unnecessarily delays permanency. Accordingly, we also withdraw any language in <u>Steven H.</u> suggesting the agency must wait six months after the last out-of-home placement order is issued before filing a TPR petition.

B. Sufficiency of the Evidence[10]

¶28 The second issue is whether there was sufficient evidence to meet the other elements of the continuing CHIPS

---

[10] Although sufficiency of the evidence was not raised in the petition for review, we elect to address it in the interest of efficiency. <u>See</u> <u>State v. Johnson</u>, 153 Wis. 2d 121, 126, 449 N.W.2d 845 (1990)(When decision on "issue for which the court accepted the petition for review" results in need to decide a second issue, we may elect to decide the second issue.); <u>Chevron Chem. Co. v. Deloitte & Touche</u>, 176 Wis. 2d 935, 945, 501 N.W.2d 15 (1993)("[O]nce a case is before us, we have discretion to review any substantial and compelling issue the case presents.").

ground for TPR under Wis. Stat. § 48.415(2)(a). The elements are:

> (1) The child has been adjudged CHIPS and placed or continued in placement outside his or her home pursuant to one or more CHIPS orders containing the statutorily prescribed notice; § 48.415(2)(a)1.,
>
> (2) The responsible agency "made a reasonable effort to provide the services ordered by the court"; § 48.415(2)(a)2.,
>
> (3) The child has resided outside the home "for a cumulative total period of 6 months or longer" under CHIPS order(s); § 48.415(2)(a)3., and
>
> (4) "[T]he parent has failed to meet the conditions established for the safe return of the child to the home and there is a substantial likelihood that the parent will not meet these conditions within the 9-month period following the fact-finding hearing under s. 48.424." § 48.415(2)(a)3.

St. Croix County had the burden to prove all four elements by clear and convincing evidence.

¶29 Our standard of review in a challenge to the sufficiency of the evidence is whether there is any credible evidence to sustain the verdict. Sheboygan Cnty. DHHS v. Tanya M.B., 2010 WI 55, ¶49, 325 Wis. 2d 524, 785 N.W.2d 369. Under this standard, we conclude the evidence was sufficient.

¶30 First, as already discussed above, there is credible evidence to show St. Croix County satisfied the first element——the notice element. It is undisputed that Matthew was a child in need of protection or services placed outside his home under CHIPS orders and one of those orders——the October 11, 2011 order——contained the written notice prescribed by statute.

22

¶31 Second, there is credible evidence to show St. Croix County made reasonable efforts to provide Juanita services ordered by the court. Wisconsin Stat. § 48.415(2)(a)2. defines "reasonable effort" as "an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child . . . , the level of cooperation of the parent . . . and other relevant circumstances of the case." The trial court found St. Croix County "did make reasonable efforts to provide services ordered by the court." There is credible evidence both in the testimony at the fact-finding hearing in this case and in the CHIPS file to support this element.

¶32 Dina Williams testified that she is employed by St. Croix County as a child protection social worker and worked with Juanita since Matthew was initially removed from the home when he was eight days old. Williams explained the efforts St. Croix County made to provide services to Juanita:

> We've had a coordinated family services team, a community support team. Juanita's had an individual therapist, three different individual therapists at minimum. She's had a mental health worker, a psychiatrist that monitors her medications. We have provided respite services, transportation in way of -- whether it be a gas card or taking her to and from places if needed, as well as for Matthew. There's personal care workers for both Juanita and for John. Again, the Birth to 3, early Head Start. He's had early childhood. Now he's in the 4K and preschool program.

Williams testified that since Matthew was removed in 2011, Juanita received twice-a-week and then three-times-a-week

23

supervised visits from St. Croix County employees who transported Matthew to Juanita's home, offered parenting and safety suggestions during the visits, and provided any other help Juanita needed. One of those employees, Ann Larson, a program aide at St. Croix County Family and Children's Services Department, testified that she tried to help Juanita learn better parenting skills by making suggestions with respect to proper food portions, talking to Juanita about safety concerns such as pill bottles within Matthew's reach, getting a lock on the gate in the yard, and fixing a large gap in the gate that Matthew could slip through and escape from the yard. Larson also testified she was there to provide resources for Juanita, but Juanita had not asked for any help to improve her parenting skills.

¶33 Dawn Noll, another St. Croix County program aide, testified that she worked with Juanita for seven years, offering parenting suggestions and providing transportation. After Matthew was removed from Juanita's home, Noll transported Matthew back and forth for weekly supervised visits with Juanita, and helped Juanita with parenting. Juanita testified she had a personal care worker assigned by the County who came two hours a day on Monday, Tuesday, Thursday, Friday and every other Saturday to help Juanita bathe and do household chores. Williams testified: "We have exhausted all services that we can possibly think of or that are available to us or to the family." Collectively, this testimony is sufficient to demonstrate that

24

St. Croix County made reasonable efforts to provide services to Juanita.

¶34 Third, it is not disputed that Matthew was outside his home for more than six months. He was removed in July 2011 and never returned. The TPR petition was filed in June 2013. Matthew was outside the parental home for much longer than the required "cumulative period of six months."

¶35 Fourth, there is credible evidence establishing Juanita's failure to meet the conditions necessary for Matthew's safe return to Juanita's home. The circuit court imposed 14 conditions:

(1) Juanita shall demonstrate the ability to supervise Matthew at all times.

(2) Juanita shall demonstrate the ability to provide, enforce and follow through with age appropriate discipline techniques with Matthew, when necessary.

(3) Juanita shall continue to learn parenting skills with the Parent Aide with St. Croix County Family & Children's and demonstrate the ability to use these skills.

(4) Juanita shall provide a structured routine, including but not limited to, meals, naps, bedtime, bathing, etc., for Matthew and follow through with this routine.

(5) Juanita shall keep her home free of all safety hazards that may endanger Matthew's health and/or safety, out of his reach including, but not limited to, all sharp objects, food that has been out longer than 2 hours, raw meat, heavy objects that are at risk of falling on or near Matthew, plastic bags, hangers, electric cords, electric outlets, and medications, and will demonstrate the ability to follow through.

25

(6) Juanita shall learn and practice basic housekeeping skills and basic home management skills which will also help in keeping the home free from safety hazards.

(7) Juanita shall demonstrate the ability to keep Matthew safe while playing outside by following him where he is playing, holding his hand when walking to different areas and staying within 10 feet or less of him in non-enclosed settings.

(8) Juanita shall follow through with Birth to 3, Early Head Start and Speech Therapy recommendations when it comes to teaching Matthew verbal skills and having Matthew use his words to enhance his speech and communications skills. Juanita will demonstrate this ability without the assistance, guidance or support of other individuals.

(9) Juanita shall follow through with all recommendations made by her physicians when it pertains to her physical health and well-being. Juanita shall follow through with basic hygiene and self-care techniques to improve overall basic functioning and health.

(10) Juanita shall sign any and all releases deemed necessary and appropriate by the Department. This includes releases to be signed for the social Worker to discuss Juanita's health and well-being with her various health care providers. These will be signed at the time requested. If a request is deemed by Anita to be unreasonable the court shall be notified for a review hearing to be scheduled as soon as possible.

(11) Juanita shall not have any other individuals living with her (aside from her eldest son, John or her sister, Julie) without permission of the social worker and GAL.

(12) Warnings for Termination of Parental Rights shall be administered to Juanita.

> (13) Juanita shall meet with the assigned social worker as deemed necessary and appropriate and will also acknowledge unannounced home visits.
>
> (14) In all other respects, the current CHIPS Court Order recommendations are still in effect and will continue to be followed.

¶36 Although we agree with Juanita that she was able to meet some of these conditions, the record contains credible evidence establishing that she failed to meet all of them. Williams testified Juanita attempted to meet the conditions for return, but "she's not able to complete all of them on a consistent basis." Williams explained:

- Juanita "has not demonstrated the ability to supervise Matthew at all times without the assistance of others. She has not been able to demonstrate the ability to provide, enforce, and follow through with age-appropriate discipline techniques with--at all times on her own without assistance. She does at times, but not always." Juanita's focus is frequently on arguing with her older son and "Matthew is often just lost in the shuffle" leaving Matthew unsupervised.

- Juanita's parenting skills have improved, but she does not have "the ability to use these skills" "on a consistent and ongoing basis."

- Juanita typically does not have a structured plan for the visits.

- Juanita's ability to make her home safe has improved, "but there continues to be incidents where, again, medications have been left out. This is something I have repeatedly talked to Juanita about." When playing outside, "the gate [is] not properly latched, if latched at all."

- With regard to the condition to keep a clean home, Juanita cannot do this on a consistent basis. "She needs reminders" "continuous reminders on [how] to keep the house clean." The floor was "filthy,"

27

there were dirty dishes "from last night's meal still out on the counter, food, dishes in the living room," dirty laundry, and the bathroom was so dirty Matthew did not want to use it.

- Juanita is "often sitting when [Matthew's] off playing" and not within the ten-feet required by the conditions to keep him safe.

- Juanita keeps up with the early education and speech requirements but only because she is reminded to do so. Once reminded, Juanita will "make the effort to do it for a short period of time, but it doesn't continue as an ongoing basis."

- Juanita has rescinded all of her medical releases and will not allow any contact with her personal physicians or her "protective payee in regards to her financial situation and whether or not she is able to financially support herself and her children."

Williams' testimony provides credible evidence to establish Juanita's failure to meet the conditions.

¶37 There was also credible evidence demonstrating a substantial likelihood that Juanita would not meet the imposed conditions within the nine-month period following the fact-finding hearing. Williams testified that Juanita would not be able to comply with the conditions for return within the nine months following the hearing and that: "We have exhausted all services that we can possibly think of or that are available to us or to the family." St. Croix County Department of Social Services worked with Juanita since Matthew was eight days old. It provided her with significant support for years, yet Juanita could not consistently demonstrate an ability to properly supervise Matthew or maintain a safe home for Matthew. Williams testified that Juanita would be able to exhibit the parenting

28

skills she had been taught for at most one month "before she goes back to the old behaviors." There was nothing to show that Juanita could accomplish in another nine months what she was unable to do in the prior four and a half years. Thus, credible evidence supports this element.

### III. CONCLUSION

¶38 We hold that the notice Juanita received satisfied the statutory notice element of a TPR action grounded in continuing CHIPS set forth in Wis. Stat. § 48.415(2). The notice required under Wis. Stat. § 48.356(2)(a)1. was satisfied with the written October 11, 2011 order. In a TPR case based on the continuing CHIPS ground, Wisconsin Stat. § 48.415(2) does not require proof that notice was given in every CHIPS order removing a child from the home or extension thereof; it also does not require proof that notice was in the last CHIPS order. Rather, it requires proof that one or more of the CHIPS orders removing a child from the home, or extension thereof, contain the written notice required under § 48.356(2).

¶39 We further hold that Steven H. did not establish an unequivocal "last order, plus six-months rule." Wisconsin Stat. § 48.415(2) does not use the term last order; rather, the legislature chose to use the phrase "one or more." Accordingly, if "one or more" of the CHIPS orders in a TPR case contains the statutorily prescribed written notice, regardless of whether it was the first, last, or any order in between, such notice satisfies the phrase "one or more." Likewise, the statutes do not require that six months must pass after the last CHIPS order

29

before a TPR petition can be filed. Rather, the relevant statute requires proof that a child was "outside the home for a cumulative total period of 6 months or longer." Wis. Stat. § 48.415(2)(a)3. We do not overrule Steven H. It remains good law except that we withdraw our conflicting sentence in paragraph 3 and clarify the last sentence in paragraph 31. See supra ¶2, ¶4 nn.3-4, & ¶¶18-25, ¶27.

¶40 We also hold that the record contains credible evidence sufficient to establish continuing CHIPS as a ground for terminating Juanita's parental rights. The record contains credible evidence showing: Matthew was adjudged CHIPS and placed outside Juanita's home pursuant to one or more CHIPS orders containing the statutorily prescribed written notice; St. Croix County made reasonable efforts to provide services to Juanita; Matthew resided outside of Juanita's home for longer than six months; Juanita failed to meet all of the conditions required for his return; and there was a substantial likelihood that Juanita would not meet those conditions within the nine months following the fact-finding hearing. Accordingly, we reverse the court of appeals' decision and affirm the circuit court's order terminating Juanita's parental rights to Matthew.

*By the Court.*—The decision of the court of appeals is reversed.

¶41 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring)*. I fully join the majority opinion. However, I write in concurrence to address what appears to be Justice Shirley Abrahamson's practice of lending the prestige of her judicial office to further private interests.

¶42 Justice Abrahamson says she writes to "compare Justice Rebecca G. Bradley's public approach to the role of a new justice in deciding cases argued and pending on her appointment and the approach taken in the past in this court and in the United States Supreme Court regarding the role of a new justice."[1] However, an examination of what she says in her three separate writings, when combined with what she does not tell readers of those separate writings, evidences that she is engaged in a different pursuit.

¶43 Justice Abrahamson's writings repeatedly omit important facts well known to her; they are attached to court decisions in which her assaults on Justice Rebecca Bradley are not relevant to legal issues presented to the court for decision; and this is the third opinion since December 18, 2015, in which she has attacked Justice Rebecca Bradley by implying that her decisions about when to participate in cases pending before the court are improper.

¶44 Therefore, as Chief Justice of the Wisconsin Supreme Court, I write to provide transparency by setting out important

---

[1] Justice Abrahamson's dissent, ¶136.

facts known to Justice Abrahamson, which she has chosen to omit from her writings in three cases.

¶45 A brief narration of relevant historic facts is necessary to understand my concerns. On September 17, 2015 and September 18, 2015, Justice N. Patrick Crooks did not attend oral argument in six cases that were argued on those two days. He watched oral argument on WisconsinEye and then participated in our decision conferences by telephone. As arguments began on September 17 and again on September 18, I told counsel that Justice Crooks would be absent from oral argument, but would participate in the decision conference by phone.

¶46 The court reached tentative decisions in five of the six cases argued. Justice Crooks would have participated in the released opinions of all cases that were tentatively decided if his death had not intervened.[2]

¶47 On September 17, we heard oral argument in St. Croix County, the case now before us. Justice Abrahamson asserts that Justice Rebecca Bradley is "[t]aking a different and contrasting approach to this prior precedent."[3] However, Justice Abrahamson

---

[2] Justice Abrahamson asserts, "There is precedent in this court for a member of the court to do as Justice Crooks explained he would do." Justice Abrahamson's dissent, ¶141 n.53.

If there is "precedent" that was created by other justices' absences from oral argument and subsequent participations in the decision conference by phone as Justice Abrahamson asserts, it is not noted in our opinions. This absence is reasonable because the manner in which a justice participates has nothing to do with issues presented to the court for review.

[3] Justice Abrahamson's dissent, ¶147.

2

knows that Justice Crooks participated in St. Croix County in very much the same manner as Justice Rebecca Bradley has: both listened to oral argument on WisconsinEye and both participated in the decision conference, Justice Crooks by phone and Justice Rebecca Bradley in person when the court held a second decision conference. Furthermore, Justice Rebecca Bradley's decision to participate in St. Croix County is not a legal issue presented to the court for resolution in St. Croix County.

¶48 Twice before, once in a dissent and once in a concurrence, Justice Abrahamson omitted important facts known to her and in so doing, through the facts that she did relate, she drew into question the propriety of Justice Rebecca Bradley's decisions about whether to participate in pending cases. The repetitive nature of her omissions of known facts heightens my concern.

¶49 For example, in her dissent in State v. Matalonis, 2016 WI 7, 366 Wis. 2d 443, 875 N.W.2d 567, Justice Abrahamson said, "the court heard oral argument in the instant case [Matalonis] and eight other cases. Justice N. Patrick Crooks participated in these nine cases."[4] Justice Abrahamson asserted that Justice Rebecca Bradley's "participation in those cases without a reargument appear[s] to be internally inconsistent and inconsistent with the court's prior practice."[5]

---

[4] State v. Matalonis, 2016 WI 7, ¶73, 366 Wis. 2d 443, 875 N.W.2d 567 (Abrahamson, J., dissenting)

[5] Id., ¶82.

3

¶50 When she wrote her dissent in Matalonis implying impropriety in Justice Rebecca Bradley's participation because the court did not hold another oral argument, Justice Abrahamson knew that Justice Crooks did not participate in oral argument in Matalonis because she knew that he did not attend oral arguments on September 18. Nevertheless, Justice Abrahamson did not disclose to readers of Matalonis that Justice Crooks watched oral argument on WisconsinEye, just as Justice Rebecca Bradley has, and that his involvement in the decision conference was by telephone, while Justice Rebecca Bradley personally participated in a subsequent decision conference. Justice Abrahamson also did not disclose to readers of Matalonis that the court has no prior practice to follow when a justice joins the court mid-term.[6] And finally, Justice Rebecca Bradley's decision to participate in Matalonis is not relevant to deciding the legal issues presented by that case.

¶51 Justice Abrahamson's omissions have caused at least one reader to question Justice Rebecca Bradley's decision to

---

[6] The last death that occurred during a court term was that of Justice Horace Wilkie, who died May 23, 1976. Although Justice Abrahamson was appointed to replace him, she did not join the court mid-term as Justice Rebecca Bradley has. Rather, she began September 7, 1976, at the beginning of the court's term.

4

participate in Matalonis, claiming that her participation violated Matalonis's rights of due process and equal protection.[7]

¶52 The first time Justice Abrahamson made allegations about Justice Rebecca Bradley's participation was in her concurrence to New Richmond News v. City of New Richmond, 2015 WI 106, 365 Wis. 2d 610, 875 N.W.2d 107, which was argued September 18. There, she wrote, "Prior to September 21, 2015 [the date of Justice Crooks' death], the court heard oral argument in nine cases. Justice N. Patrick Crooks participated."[8] Once again, when she issued her concurrence in New Richmond News, Justice Abrahamson knew that Justice Crooks did not participate in oral arguments for all of those cases because six cases were argued on September 17 and September 18 when Justice Crooks was absent from oral argument. She also knew that the court did not reach a tentative decision in New Richmond News at the decision conference on September 18 because she refused to vote, held the case and voted for the first time after Justice Crooks' death.

¶53 Omitting important facts known to her at the time of her writings permits Justice Abrahamson to imply that by deciding to participate in St. Croix County and Matalonis, and

---

[7] The author of the motion for reconsideration states that "Justice Shirley S. Abrahamson provides much of the background of facts and circumstances pertinent to Matalonis' motion for reconsideration in her dissenting opinion, State v. Matalonis, 2016 WI 17, ¶¶68-84." Mot. for Recons. 2 n.2

[8] New Richmond News v. City of New Richmond, 2015 WI 106, ¶10, 365 Wis. 2d 610, 875 N.W.2d 107 (Abrahamson, J., concurring).

5

deciding not to participate in <u>New Richmond News</u>, Justice Rebecca Bradley violated established rules of this court.

¶54 Nothing could be further from the truth. As Justice Abrahamson well knows, this court has no procedure that directs how the court and the justices are to proceed when a justice leaves mid-term and another justice takes his or her place. Limited guidance is found in our Internal Operating Procedures which provide:

> A justice may recuse himself or herself under any circumstances sufficient to require such action. The grounds for disqualification of a justice are set forth in Wis. Stat. § 757.19. The decision of a justice to recuse or disqualify himself or herself is that of the justice alone.

IOP, II.L.1. Although the IOP is not directly on point, it supports Justice Rebecca Bradley's decisions. Furthermore, Justice Abrahamson is well aware that Justice Rebecca Bradley did extensive research in advance of deciding how to proceed because Justice Rebecca Bradley shared her research with the court.

¶55 And finally, Justice Abrahamson is well aware that this court was presented with her version of United States Supreme Court procedures that she asserts are employed when a justice leaves the United States Supreme Court mid-term. She also knows that we did not adopt those procedures for use by Wisconsin Supreme Court justices. All of those facts are missing from her three writings that attack Justice Rebecca Bradley.

¶56 Because Justice Abrahamson has omitted important facts from her separate writings that were well known to her when she personally attacked Justice Rebecca Bradley and because her attacks immediately preceded the election of a justice to our court, it appears that Justice Abrahamson is using the prestige of her judicial office to further private interests.

¶57 While Justice Abrahamson is free to speak in support of her political views in many other forums, as Justice Ann Walsh Bradley did in her public endorsement of Joanne Kloppenburg, Justice Rebecca Bradley's opponent in the April 5, 2016 election for supreme court justice, justices are constrained from doing so in court opinions, which should address legal issues presented to the court for decision. Accordingly, I respectfully concur in the majority opinion.

¶58 I am authorized to state that Justice REBECCA G. BRADLEY joins this concurrence.

¶59 DAVID T. PROSSER, J. *(concurring).* This case presents a classic example of the challenges facing appellate courts. It compels us to resolve a question arising out of the convergence of ambiguous statutory language, well-reasoned but conflicting precedent, and a heart-wrenching factual situation.

¶60 Wisconsin Stat. § 48.415 is the Wisconsin statute listing grounds for the termination of parental rights. Subsection (2) discusses the ground of "Continuing Need of Protection or Services" and sets out what a county must prove to establish this ground.

¶61 Subsection (2)(a)1. lists the first item of proof:

> (a)1. That the child has been adjudged to be a child . . . in need of protection or services and placed, or continued in a placement, outside his or her home pursuant to one or more court orders under s. 48.345, 48.347, 48.357, 48.363, 48.365, 938.345, 938.357, 938.363 or 938.365 containing the notice required by s. 48.356(2) or 938.356(2).

¶62 To understand what the first item of proof requires, we must examine and interpret Wis. Stat. § 48.356, especially subsection (2). The statute reads:

> 48.356 Duty of court to warn.

> (1) Whenever the court orders a child to be placed outside his or her home, orders an expectant mother of an unborn child to be placed outside of her home, or denies a parent visitation because the child or unborn child has been adjudged to be in need of protection or services under s. 48.345, 48.347, 48.357, 48.363, or 48.365 and whenever the court reviews a permanency plan under s. 48.38(5m), the court shall orally inform the parent or parents who appear in court or the expectant mother who appears in court of any grounds for termination of parental rights under s. 48.415 which may be applicable and of the conditions necessary for the child or expectant

1

mother to be returned to the home or for the parent to be granted visitation.

(2) In addition to the notice required under sub. (1), any written order which places a child or an expectant mother outside the home or denies visitation under sub. (1) shall notify the parent or parents or expectant mother of the information specified under sub. (1).

¶63 As the majority opinion explains, after St. Croix County presented its case at a fact-finding hearing, Juanita's counsel moved the circuit court to dismiss the TPR petition on grounds that the county had failed to prove elements related to the statutory sections quoted above. Majority op, ¶10. In short, Juanita claimed that the county had not provided adequate written notice under the statutes.

¶64 One of the ablest circuit judges in Wisconsin, Edward F. Vlack, concluded that there had been "substantial compliance."

¶65 Judge Vlack's terminology was ironic because in 1988 the court of appeals held: "If a statute is mandatory, its observance is usually said to be imperative. We conclude that substantial compliance with sec. 48.356(2), Stats., is insufficient." D.F.R. v. Juneau Cty. DSS, 147 Wis. 2d 486, 493, 433 N.W.2d 609 (Ct. App. 1988) (citation omitted). The court of appeals then ruled: "Because the department did not establish that D.F.R.'s children had been outside her home for a cumulative total period of one year or longer pursuant to dispositional orders containing the notice required by sec. 48.356(2), Stats., the trial court erred in terminating D.F.R.'s parental rights." Id. at 499.

2

¶66 The result in D.F.R. introduced grave uncertainty and hardship into the lives of two young children.

¶67 More than a decade later, this court reviewed a case in which the circuit court terminated a father's rights to his daughter. The court of appeals reversed the circuit court because some orders removing the daughter from her home did not include the written notice prescribed by Wis. Stat. § 48.356(2) (1997-98).

¶68 The court of appeals reluctantly followed the D.F.R. case:

> Despite our firm belief that substantial compliance should apply in this case, we are compelled by D.F.R. v. Juneau County Department of Social Services, 147 Wis. 2d 486, 433 N.W.2d 609 (Ct. App. 1988), to reverse the termination order.
>
> . . . .
>
> This is an extremely unfortunate case. However, the result is compelled by the statutes and D.F.R. The author of this opinion has believed D.F.R. to be incorrect from the beginning. This court believed when D.F.R. was decided, and still believes now, that substantial compliance is a viable and reasonable tool with which to reach the correct result in a case like this one. When a parent receives actual notice, like the one Steven orally obtained from the trial court at the March 27, 1996 hearing, the hypertechnical notice requirements of the statute should not have to be followed to the letter.

Waukesha Cty. v. Steven H., No. 1998AP3033, unpublished slip op. at 2, 7 (Wis. Ct. App. Feb. 24, 1999).

¶69 On review, a unanimous supreme court reversed, concluding that:

> Wis. Stat. §§ 48.356(2) and 48.415(2) do not require that each and every order removing a child from his or her home contain the written notice prescribed by

3

§ 48.356(2) in order for the termination of parental rights to proceed. . . . This interpretation of §§ 48.356(2) and 48.415(2) ensures that a parent receives the written notice required by § 48.356(2) in a timely manner and does not vitiate a termination of parental rights proceeding when one or more previous orders fails to contain the statutorily prescribed written notice.

Waukesha Cty. v. Steven H., 2000 WI 28, ¶3, 233 Wis. 2d 344, 607 N.W.2d 607.

¶70 There were no amendments to the relevant statutes between 1988 and 2000 that necessitated an altered interpretation of the two statutes. What changed was the court's perception that unbending adherence to the statutory text was producing unconscionable results for children, even though the affected parents had received plenty of actual notice, though perhaps not the repeated written notice implied by Wis. Stat. § 48.356(2).

¶71 This court's Steven H. opinion was a brilliant exercise of judicial craftsmanship. It discerned the ambiguity in the wording of Wis. Stat. § 48.356 in relation to Wis. Stat. § 48.415(2). It distinguished the D.F.R. case. It seized on a fact——that the "last order entered a year before the start of the proceeding to involuntarily terminate parental rights did contain the written notice required," Steven H., 233 Wis. 2d 344, ¶23——to create a rule. It addressed earnestly the critical importance of protecting parents from the state "precipitously or capriciously terminating parental rights." Id., ¶5. It admonished judges that "the better practice is to include the written notice" in § 48.356(2) in all orders to which the statute applies. Id., ¶3.

4

¶72 The plain truth, however, is that the opinion in Steven H. deliberately chose not to follow the strict terms of the statute. Thus, it opened the door for the majority opinion in this case.

¶73 The entire court approved the Steven H. opinion in 2000. The entire court should approve the majority opinion now. Footnote 9 of the majority opinion succinctly provides the foundation for the court's inevitable decision and illustrates why the facts make the law.

¶74 For the foregoing reasons, I respectfully concur.

¶75 REBECCA G. BRADLEY, J. (*concurring*). For the third time this term, Justice Shirley Abrahamson has written a separate opinion discussing my participation or non-participation in cases pending in this court before I joined the court.[1] See New Richmond News v. City of New Richmond, 2015 WI 106, 365 Wis. 2d 610, 875 N.W.2d 107; and State v. Matalonis, 2016 WI 7, ¶79, 366 Wis. 2d 443, 875 N.W.2d 567. The dissent authors criticize my decision to participate in three cases: this case, Matalonis, and State v. Parisi, 2016 WI 10, 367 Wis. 2d 1, 875 N.W.2d 619;[2] but not other pending cases including New Richmond News. The dissent further suggests this court had an established procedure to follow when a new justice joins the court mid-term and that the three cases in which I chose to participate cannot be distinguished from other cases. The dissent is wrong on both points and I write separately to explain my reasons for participating in certain cases and not participating in others.

¶76 No Wisconsin statute, rule of appellate procedure, internal operating procedure ("IOP") or supreme court rule specifically addresses the participation of a newly-appointed justice in cases that were argued but not decided before the new

---

[1] For the first time, Justice Ann Walsh Bradley joins the dissent.

[2] See State v. Parisi, 2016 WI 10, 367 Wis. 2d 1, 875 N.W.2d 619. In Parisi, Justice Abrahamson did not write her own dissent and instead joined the dissent of Justice Ann Walsh Bradley, who wrote about the merits of that case rather than my participation.

1

justice was sworn in. The dissent has not cited any Wisconsin authority because none exists. This is the first time a newly-appointed justice joined the court mid-term due to the death of a supreme court justice.[3] In four cases that were argued but not decided before I was sworn in, this court was deadlocked on whether to affirm or reverse the court of appeals: this case, New Richmond News, Matalonis, and Parisi. Significantly, in those cases where the court was deadlocked at the time I joined the court, no orders had been issued affirming the court of appeals. After substantial research, I learned there was precedent on how to proceed in New Richmond News, which was the only one of the deadlocked cases that had come to this court on bypass from the court of appeals. Under State v. Richard Knutson, Inc., 191 Wis. 2d 395, 396-97, 528 N.W.2d 430 (1995), when a case is before this court on a petition to bypass or a certification, and a tie vote results, the case is remanded to the court of appeals for decision. That precedent was followed when this court vacated the bypass petition in New Richmond News, under Richard Knutson, Inc., and remanded the case to the court of appeals. This procedure recognizes that this court

---

[3] There is one other time in history of which we are aware where a supreme court justice died before the court's term concluded. Chief Justice Horace W. Wilkie died on May 23, 1976. After his death, orders were issued on June 30, 1976 affirming the county courts in cases where the supreme court was equally divided. See Punches v. Schmidt, 73 Wis. 2d 206, 243 N.W.2d 518 (1976); State v. Kline, 73 Wis. 2d 337, 243 N.W.2d 519 (1976). Justice Abrahamson was appointed to fill the vacancy created by Chief Justice Wilkie's death, but she was not sworn in until September 1976 when this court's new term began.

2

could benefit from a decision rendered by the court of appeals and then revisit the issues if one of the parties petitions for supreme court review.

¶77 There is not, however, any Wisconsin authority with respect to new justices handling pending "deadlocked" cases that have come to this court on petitions granted for review. If I declined to participate in the three "deadlocked" cases, the court of appeals' decisions would stand. This court, however, decided many months ago (April 2015 for this case and Matalonis, and June 2015 for Parisi) that the court of appeals' decisions in these three cases merited this court's review. Hundreds of petitions for review are filed with this court every year and this court accepts only a limited number of cases. When this court accepts a case for review, not only do the parties undertake significant time and expense to litigate the matter before the supreme court, but the people of the State deserve the issues presented to be decided by the supreme court. Although our court of appeals judges do an excellent job, they serve a different role than the supreme court. The court of appeals' primary function is error-correcting. See Cook v. Cook, 208 Wis. 2d 166, 188, 560 N.W.2d 246 (1997). The supreme court, on the other hand, serves the primary function of "law defining and law development." Id. As a member of this court, it is my duty to participate in those cases so that the people of Wisconsin receive a decision from the supreme court. In each of the deadlocked cases, nothing had been decided and no orders or opinions had been issued at the time I joined the court. It

3

is also important to note that the initial vote on these three cases after the passing of Justice Crooks was 3-3. Although this case and _Parisi_ ultimately were released as 5-2 decisions, this could not have impacted my analysis regarding these cases in which I would participate because at the time I chose to participate, these cases were deadlocked 3-3. The dissent misleads the public in paragraph 145 by omitting this important fact when it references the 5-2 final result in this case and _Parisi_. In doing so, the dissent implies this case and _Parisi_ were treated differently. That is not true. My participation analysis was consistent with respect to each of these cases.

¶78 In each deadlocked case, I watched oral arguments on WisconsinEye[4] and would have requested re-argument if important questions had been left unanswered. We are fortunate to have every oral argument video-recorded and available for viewing on WisconsinEye. These recordings are of high quality, allowing viewers to see the argument as if they were present. WisconsinEye has multiple video-cameras, which rotate between the lawyers arguing at the podium and the justices asking questions. All demeanors, hand gestures, and other non-verbal forms of communication are contained in the video-recordings. These video-recordings have allowed past justices, who could not attend oral argument in person, to do the same thing I did——watch the oral argument on WisconsinEye.

---

[4] WisconsinEye, http://www.wiseye.org (last visited Feb. 23, 2016).

¶79 Following my review of each deadlocked case, I participated in conferences with my fellow justices for further discussion of and to reach a majority decision in each case, pursuant to IOP II.E, governing post-argument decision conference. This reasonable procedure provided the best option allowing this court to timely decide cases upon which it agreed the supreme court needed to give guidance. The people of Wisconsin deserve timely decisions from this court. If the oral arguments had not been video-recorded and available for viewing, we would have been forced to subject these parties to the additional cost and inconvenience of re-arguing, for the sake of one new justice, the exact same arguments that had already been presented a short time earlier to the other six justices. Justice Abrahamson's proposed procedure requiring reargument would have delayed justice, added unnecessary expense, and may have even delayed these cases into the 2016-17 term.

¶80 Similar to Wisconsin, there is no federal rule specifically addressing what should occur when a new justice joins the court after the term has commenced, with respect to pending cases on which the court has reached an impasse and no decision has been issued. While there is a federal rule addressing petitions for rehearing, such petitions are similar to Wisconsin's reconsideration motions and, like the Wisconsin rule, the federal rule applies only to judgments or decisions of the court. This is made clear in Stephen M. Shapiro, et al., Supreme Court Practice, 838 (10th ed. 2013), which states that "rehearing petitions have been granted in the past where the

5

prior decision was by an equally divided Court." (Emphasis added.) At the risk of being unduly repetitive but in order to underscore the significance of this fact, no judgments or decisions had been issued in the deadlocked cases at the time I joined the court.

¶81 My participation in the deadlocked cases is supported by the past practices of the United States Supreme Court under similar circumstances. Following the death of Chief Justice William H. Rehnquist and the appointment of Justice Samuel Anthony Alito, Jr., that Court revisited three cases in which the Court was presumed to be deadlocked; Justice Alito joined the 5-4 majority in each case following re-argument. See Shapiro, supra, at 838.

¶82 Even though Justice Abrahamson explained her concerns in her concurrence in New Richmond News, she elected to write separately a second time in Matalonis, criticizing my decision to participate in Matalonis. Although I could have responded to her dissent in Matalonis, I chose not to because the dissent was unrelated to the merits of the case. I believed Matalonis would be Justice Abrahamson's last separate writing criticizing my participation and I chose not to write separately to avoid further delaying the release of the Matalonis opinion.

¶83 In the dissent here, Justice Abrahamson goes beyond her writings in New Richmond News and Matalonis by including a reference to the allegations of Matalonis's lawyer——allegations made in a motion for reconsideration based on Justice Abrahamson's criticism of my participation. By memorializing in

6

her dissent here the adversarial allegations made by an attorney not even involved in the case at hand, Justice Abrahamson has revealed her true motivation behind her critical concurrence and dissents. Justice Abrahamson's separate writings were not about documenting for future courts how to properly handle pending cases when a justice dies mid-term and a new justice joins the court. Including the non-prevailing lawyer's adversarial allegation from Matalonis——an entirely separate case——in the dissent in this TPR case is entirely inappropriate and serves only one purpose: to give others material——within a published Wisconsin Supreme Court decision, no less——to attack and criticize me. The Code of Judicial Conduct requires that: "A judge shall dispose of all judicial matters promptly, efficiently and fairly." SCR 60.04(1)(h). Part II of the dissent here violates this rule and is cumulative and unnecessary as similar writings already exist in both New Richmond News and Matalonis.

¶84 Justice Abrahamson and Justice Ann Walsh Bradley suggest in this dissent that I am sharing "for the very first time" my explanation on my participation. See dissent, ¶135. Although this is the first time I have shared my reasoning for participation in a written opinion, Justices Abrahamson and Ann Walsh Bradley have known my reasons since October 2015 when I provided them (and the entire court) with my reasons for participating based on the substantial research I conducted. I did not feel it necessary or appropriate to delay release of these opinions to include a discussion of my participation

7

decision. Justice Abrahamson now joined by Justice Ann Walsh Bradley did not agree with the reasonable, well-researched, and supported decision I made. Instead of accepting it, Justice Abrahamson chose to repeatedly criticize me: first in New Richmond News by arguing I should have participated and then in Matalonis because I did participate. In New Richmond News, she complained that remanding to the court of appeals delays a decision, yet in Matalonis and St. Croix, (joined by Justice Ann Walsh Bradley in St. Croix), advocates for a procedure that delays both decisions. Justice Abrahamson also engaged in multiple revisions of the dissent here causing substantial delay in the release of this opinion. Her decision to write separately in these cases has delayed justice, and with respect to this case in particular, where efficient resolution is paramount because this case involves a child's well-being, this is particularly troubling. Part II of the dissent contributes nothing to any legitimate function of the court and serves only to perpetuate the diminished reputation of Wisconsin's highest court, which my other colleagues and I are striving to restore. The time Justice Abrahamson spent on these separate writings would have been better served drafting a proposed rule to establish a procedure specifically addressing these circumstances. Perhaps this court should enact a rule outlining the proper procedure for processing deadlocked cases when a new justice joins the court after the term has commenced so new justices are not forced to defend themselves against decisions made in good faith. At present, no such rule or procedure

exists, and as I have explained, neither Justice Abrahamson's experience in 1976 nor the United States Supreme Court practices mirrors the circumstances presented here.

¶85 SHIRLEY S. ABRAHAMSON, J. and ANN WALSH BRADLEY, J. *(dissenting).* Stare decisis (Latin for "let the decision stand") is a basic tenet of the rule of law.[1] Although stare decisis is not a mechanical formula requiring blind adherence to precedent, departing from precedent requires special justification,[2] and "[n]o change in the law is justified by a change in the membership of the court or a case with more egregious facts."[3]

¶86 Although the majority opinion states that it "adher[es] to the important principle of stare decisis,"[4] it does not. The majority opinion, without special justification, departs from a unanimous, workable, and settled precedent of this court, Waukesha County v. Steven H., 2000 WI 28, 233 Wis. 2d 344, 607 N.W.2d 607, and unjustly terminates the parental rights of Juanita A., a single mother with cognitive difficulties, to her son, Matthew D. The termination is based on continuing "child in need of protection or services" ("CHIPS") grounds.

¶87 At issue in the instant case is whether Juanita A. received notice required under Wis. Stat. §§ 48.356(2) and

---

[1] See Bartholomew v. Wis. Patients Comp. Fund, 2006 WI 91, ¶31, 293 Wis. 2d 38, 717 N.W.2d 216.

[2] Bartholomew, 2006 WI 91, ¶31 (citing Johnson Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257).

[3] State v. Stevens, 181 Wis. 2d 410, 442, 511 N.W.2d 591 (1994) (Abrahamson, J., concurring) (quoted source omitted).

[4] Majority op., ¶3.

1

48.415(2) of the grounds for termination of her parental rights and the conditions for the return of Matthew D. to her home.

¶88 The notice requirements contained in these two statutes are an important part of the "panoply of procedures" created by the legislature "to assure that parental rights will not be terminated precipitously or capriciously when the state exercises its awesome power to terminate parental rights."[5]

¶89 As the court of appeals in the instant case correctly concluded, under this court's unanimous decision in Steven H., Juanita A. did not receive the required statutory notice of the grounds for termination of her parental rights and the conditions for the return of her son.

¶90 Rather, over the course of these proceedings, at least 27 orders were issued, four of which were required under Wis. Stat. § 48.356(2) to contain written notice of the grounds for termination of her parental rights and the conditions for the return of Juanita A.'s son. Only one of those four orders[6] contained the required notice. Oral warnings, also required by statute, were provided only three of the seven times they were required. See Wis. Stat. § 48.356(1). Compounding these notice deficiencies, after receiving the only order containing the required notice, Juanita A. received several orders containing

---

[5] Waukesha Cnty. v. Steven H., 2000 WI 28, ¶25, 233 Wis. 2d 344, 607 N.W.2d 607.

[6] This order, issued on October 11, 2011, revised an order entered on August 2, 2011, which did not contain written warnings.

2

contradictory information or suggesting that termination of her parental rights may no longer have been a risk.

¶91 The majority opinion sets aside these troubling facts, departs from Steven H., and concludes that one order containing a required statutory notice is sufficient to allow the termination of Juanita A.'s parental rights to Matthew D.[7] In so doing, the majority opinion withdraws the language in Steven H. adopting the "last order" notice rule and replaces it with an "at least one order" notice rule.[8]

¶92 We disagree with the majority opinion. We would adhere to the unanimous opinion in Steven H. and affirm the court of appeals in the instant case. We would hold that Juanita A. did not receive the required statutory notice of the grounds for termination of her parental rights and the conditions for the return of Matthew D.; the "last order" placing Matthew D. outside the home did not contain the required statutory notice.

¶93 We write separately to make two points:

1.  The majority opinion departs from precedent. Although the statutes at issue in Steven H. and in the instant case have not changed, the majority opinion is misleading in stating that it "adher[es] to the

---

[7] Majority op., ¶2.

[8] Majority op., ¶17.

important principle of stare decisis" in "clarifying" Steven H. by limiting its holding to its facts.[9]

To interpret Steven H. as limited to its facts, the majority opinion withdraws the holding in Steven H. adopting the "last order" notice rule.[10]

The majority opinion is misguided.  It ignores the accepted rules of statutory interpretation, dilutes the notice given to parents, and departs from precedent without special justification.

Nothing aside from the membership of the court has changed since Steven H.  A change in membership of the court does not justify a departure from precedent.

2.  The change in membership of this court——specifically, the participation of Justice Rebecca G. Bradley, the author of the majority opinion in the instant case—— appears inconsistent with past practice in this court and in the United States Supreme Court regarding the participation of a newly appointed justice in cases

---

[9] See majority op., ¶¶3-4.

[10] See majority op., ¶¶4 & nn.3-4, 17.

4

heard and tentatively decided prior to the new justice's joining the court.[11]

¶94 For the reasons set forth, we dissent and write separately.

I

¶95 In Steven H., this court addressed whether written notice of the grounds for termination of parental rights and the conditions necessary for the child to be returned to the home is required, as Wis. Stat. § 48.356 states, in "any written order"[12]

---

[11] Wisconsin Supreme Court Internal Operating Procedure II.E states that after oral argument, "[w]hen possible, the court reaches a decision in each of the cases argued that day, but any decision is tentative until the decision is mandated."

[12] Wisconsin Stat. § 48.356 provides:

(1) Whenever the court orders a child to be placed outside his or her home, orders an expectant mother of an unborn child to be placed outside of her home, or denies a parent visitation because the child or unborn child has been adjudged to be in need of protection or services under s. 48.345, 48.347, 48.357, 48.363, or 48.365 and whenever the court reviews a permanency plan under s. 48.38(5m), the court shall orally inform the parent or parents who appear in court or the expectant mother who appears in court of any grounds for termination of parental rights under s. 48.415 which may be applicable and of the conditions necessary for the child or expectant mother to be returned to the home or for the parent to be granted visitation.

(2) In addition to the notice required under sub. (1), any written order which places a child or an expectant mother outside the home or denies visitation under sub. (1) shall notify the parent or parents or expectant mother of the information specified under sub. (1).

5

placing the child outside the home, or in "one or more court orders . . . containing the notice required by s. 48.356(2) . . ." as stated in Wis. Stat. § 48.415(2)(a)1.[13]

¶96 In other words, two statutes that are not consistent govern the notice requirements in CHIPS and termination of parental rights proceedings. The court unanimously so concluded in Steven H.:[14] "[A]lthough Wis. Stat. § 48.356(2) speaks of written notice in any order placing the child outside the home, § 48.415(2) speaks of one or more court orders placing the child containing written notice."[15] "The words 'one or more orders' in § 48.415(2) are not the equivalent of 'any,' 'each,' 'all,' or 'every' order."[16]

¶97 To harmonize this inconsistency, the Steven H. court unanimously held: (1) that Wis. Stat. §§ 48.356(2) and 48.415(2) did not require that every order removing a child from his or

---

[13] Wisconsin Stat. § 48.415(2) provides in relevant part:

(2) Continuing need of protection or services. Continuing need of protection or services, which shall be established by proving any of the following:

(a)1. That the child has been adjudged to be a child or an unborn child in need of protection or services and placed, or continued in a placement, outside his or her home pursuant to one or more court orders under s. 48.345, 48.347, 48.357, 48.363, 48.365, 938.345, 938.357, 938.363 or 938.365 containing the notice required by s. 48.356 (2) or 938.356 (2).

[14] See Steven H., 233 Wis. 2d 344, ¶¶30-32.

[15] Steven H., 233 Wis. 2d 344, ¶22.

[16] Steven H., 233 Wis. 2d 344, ¶30.

her home contain the notice prescribed by Wis. Stat.
§ 48.356(2); and (2) "that Wis. Stat. §§ 48.356(2) and 48.415(2)
<u>require</u> that the <u>last order</u> specified in § 48.356(2) placing a
child outside the home, which must be issued at least six months
before the filing of the petition to terminate parental rights,
<u>must</u> contain the written notice prescribed by § 48.356(2)."[17]
Nonetheless, the court advised that circuit courts should
include the written notice required by Wis. Stat. § 48.356(2) in
all orders to which the statute applies.[18]  The notice can easily
be attached to each written order.

¶98  The majority opinion's rejection of the "last order"
notice rule in <u>Steven H.</u> and adoption of an "at least one order"
notice rule[19] is misguided for the following reasons.

¶99  First, contrary to the majority opinion's insinuations
of conflict in decisions of the court of appeals, the "last
order" notice rule is settled law in Wisconsin.

¶100 Relying on a court of appeals decision issued shortly
after <u>Steven H.</u> was mandated in 2000, namely <u>Waushara County v.
Lisa K.</u>, 2000 WI App 145, 237 Wis. 2d 830, 615 N.W.2d 204, the
majority opinion explains that even though the "last order" in
the instant case did not contain the required notice, notice was
still adequate.

---

[17] <u>Steven H.</u>, 233 Wis. 2d 344, ¶3 (emphasis added).

[18] <u>Steven H.</u>, 233 Wis. 2d 344, ¶3.

[19] Majority op., ¶¶4, 17.

¶101 In Lisa K., the court of appeals did not apply Steven H.'s "last order" notice rule. Instead, Lisa K. distinguished Steven H. on its facts, noting that in Lisa K., the required notices of the grounds for termination of parental rights and the conditions for the return of the child were given on all occasions they were required except in the last order, and the parent did not complain of confusion as a result of the absence of notice.[20] As a result, "[c]onsidering Steven H.'s dual focus on adequate notice of the conditions with which a parent must comply and the warning that parental rights are in jeopardy," the court of appeals concluded that Lisa K. had "more than adequate notice . . . ."[21]

¶102 Lisa K. is distinguishable. Unlike the parent in Lisa K., Juanita A. understandably complains of confusion in the instant case. Juanita A. did not receive the required notice in three of the four orders placing Matthew D. outside her home. After receiving the only order containing the required notice, Juanita A. received orders containing contradictory information or suggesting that her parental rights to Matthew D. were no

_____

[20] Waushara Cnty. v. Lisa K., 2000 WI App 145, ¶10, 237 Wis. 2d 830, 615 N.W.2d 204. In Lisa K., the parties also argued that part of the "last order" incorporated by reference the previous notices given to the parent. The court of appeals did not, however, reach the question of whether that satisfied the statutory notice requirements. See Lisa K., 237 Wis. 2d 830, ¶2 nn.2-3.

[21] Lisa K., 237 Wis. 2d 830, ¶10.

longer in jeopardy.[22] The circuit court's oral warnings regarding termination of parental rights and the conditions for the return to the home were also deficient. Oral warnings were provided on three of the seven occasions they were required, and were not given at the final hearing.

¶103 Although the majority opinion relies on Lisa K., it does not adopt the "adequate notice" standard adopted in Lisa K.[23]

¶104 Instead, the majority opinion relies on Lisa K. to demonstrate its contention that "Steven H. has created a question in the court of appeals and circuit courts as to whether Steven H. created a bright-line rule requiring that the last order in a CHIPS case contain the written notice in order to satisfy Wis. Stat. § 48.415(2)(a)1. Courts . . . are ruling different ways on this question."[24]

¶105 Lisa K. is the only court of appeals decision cited by the majority opinion that concludes that failing to provide notice of the grounds for termination of parental rights and the conditions necessary for the child to be returned to the home in the "last order . . . placing the child outside the home, which

---

[22] For example, permanency hearing orders given on June 5, 2013, and May 15, 2014, state at first that the court finds the permanency goal is no longer returning Matthew D. to Juanita A.'s home, but later state that the permanency goal remains return to the home.

[23] The majority opinion suggests at times, however, that notice in the instant case was "adequate." Majority op., ¶¶18-19.

[24] Majority op., ¶18.

9

must be issued at least six months before the filing of the petition to terminate parental rights"[25] does not require dismissal of the petition to terminate parental rights.

¶106 In fact, the court of appeals has consistently followed the "last order" notice rule in Steven H. As the court of appeals put it in the instant case, Steven H.'s adoption of the "last order" notice rule "was unequivocal. The last order must contain the notice prescribed by Wis. Stat. § 48.356(2)."[26]

¶107 For cases recognizing and applying the "last order" notice rule in Steven H., see, for example:[27]

- State v. Amelia A., Nos. 2015AP630-31, unpublished slip op., ¶¶10-11 (Wis. Ct. App. June 9, 2015);

- Portage Cnty. DHHS v. Julie G., No. 2014AP1057, unpublished slip op., ¶¶20-21 (Wis. Ct. App. July 31, 2014);

- Florence Cnty. DHS v. Jennifer B., Nos. 2011AP88-90, unpublished slip op., ¶11 (Wis. Ct. App. Aug. 19, 2011);

---

[25] Steven H., 233 Wis. 2d 344, ¶3.

[26] St. Croix Cnty. Dep't of Health & Human Servs. v. Michael D., No. 2014AP2431, unpublished slip op., ¶13 (Wis. Ct. App. Jan. 16, 2015).

[27] Unpublished court of appeals decisions may be cited for purposes other than as precedent or authority. See Wis. Stat. § (Rule) 809.23(3). For example, citations to unpublished decisions are permissible to show conflict among the districts of the court of appeals. See State v. Higginbotham, 162 Wis. 2d 978, 996-98, 471 N.W.2d 24 (1991). We are citing unpublished court of appeals cases to show consistency of reasoning and result in court of appeals cases.

- Walworth Cnty. v. Jeanna R., No. 2009AP1952, unpublished slip op., ¶¶16-17 (Wis. Ct. App. Nov. 11, 2009);

- Dunn Cnty. DHS v. Debra O., Nos. 2008AP1775-77, unpublished slip op., ¶¶6-7 (Wis. Ct. App. Jan. 9, 2009); and

- State v. Zena H., Nos. 99-1777, 99-1813, unpublished slip op., ¶17 (Wis. Ct. App. Apr. 25, 2000).

¶108 The majority opinion cites some (but not all) of these authorities, but fails to recognize the court of appeals' consistent recognition and application of the "last order" notice rule adopted by Steven H.[28]

¶109 Instead, the majority opinion argues that these cases "demonstrate the factual variations that arise in TPR cases and how the courts have reached differing decisions based on Steven H."[29] Simply because different cases, with different facts, raising different legal issues have arisen since Steven H. does not undermine Steven H.'s unanimous, "unequivocal," "last order" notice rule.

¶110 Wisconsin jury instructions also recognize the "last order" notice rule adopted by Steven H. See Comment, Wis JI——Children 324A.

¶111 Second, the majority opinion relies on Pierce County v. Amy F., No. 2004AP1552, unpublished slip op. (Wis. Ct. App. Aug. 31, 2004), to support its position that courts are ruling

---

[28] Majority op., ¶20.

[29] Majority op., ¶20.

11

in different ways on whether Steven H. created a bright-line rule requiring that the last order in a CHIPS case contain the written notice.[30]

¶112 Amy F. is inapposite. It addressed a different question, namely whether a petition to terminate parental rights should be dismissed because the parent did not receive the "last order."

¶113 Third, the "last order" notice rule unanimously adopted in Steven H., unlike the "at least one order" notice rule adopted by the majority opinion in the instant case, fulfills the expressed legislative purposes of the Children's Code.

¶114 As the court stated in Steven H., the expressed legislative purposes of the Children's Code, set forth in Wis. Stat. § 48.01, "assist[] the court in interpreting the inconsistent language of the two statutes."[31] Among other

---

[30] Majority op. ¶20.

[31] Steven H., 233 Wis. 2d 344, ¶32.

Wisconsin Stat. § 48.01, captioned "Title and legislative purpose" provides in relevant part as follows:

(1) This chapter may be cited as "The Children's Code". In construing this chapter, the best interests of the child or unborn child shall always be of paramount consideration. This chapter shall be liberally construed to effectuate the following express legislative purposes:

(a) While recognizing that the paramount goal of this chapter is to protect children and unborn children, to preserve the unity of the family, whenever appropriate, by strengthening family life through assisting parents and the expectant mothers of unborn

(continued)

12

things, the expressed purposes include "assist[ing] parents . . . in changing any circumstances in the home which might harm the child . . . ," and "provid[ing] judicial and other procedures through which . . . interested parties are assured fair hearings and their constitutional and other legal rights are recognized and enforced . . . ." Wis. Stat. § 48.01(1)(a), (ad).

¶115 Unlike the majority opinion's "at least one order" notice rule, the "last order" notice rule ensures that parents "will be given adequate notice of the conditions for return and time to make any necessary changes to forestall the termination

---

children, whenever appropriate, in fulfilling their responsibilities as parents or expectant mothers. The courts and agencies responsible for child welfare, while assuring that a child's health and safety are the paramount concerns, should assist parents and the expectant mothers of unborn children in changing any circumstances in the home which might harm the child or unborn child, which may require the child to be placed outside the home or which may require the expectant mother to be taken into custody. The courts should recognize that they have the authority, in appropriate cases, not to reunite a child with his or her family. The courts and agencies responsible for child welfare should also recognize that instability and impermanence in family relationships are contrary to the welfare of children and should therefore recognize the importance of eliminating the need for children to wait unreasonable periods of time for their parents to correct the conditions that prevent their safe return to the family.

(ad) To provide judicial and other procedures through which children and all other interested parties are assured fair hearings and their constitutional and other legal rights are recognized and enforced, while protecting the public safety.

13

of parental rights . . . ." while avoiding the confusion that might result if a parent receives orders without the statutory notice after receiving earlier orders containing the required notice.[32]

¶116 Moreover, the majority opinion's "at least one order" notice rule dilutes the notice received by parents. Because petitions to terminate parental rights based on continuing CHIPS are filed by the State or county, the circuit court does not necessarily know whether an order placing a child outside the home will be the "last order."[33] As a result, circuit courts have an incentive under the "last order" notice rule to provide notice in all CHIPS orders. Under the majority opinion, a circuit court can simply provide the warnings in the first order placing the child outside the home and dispense with notice thereafter.

¶117 Although the majority opinion expresses "confiden[ce]" that its holding will not dilute the notice received by parents,[34] the court is wading into dangerous waters. "A parent's desire for and right to the companionship, care, custody, and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection." Sheboygan Cnty.

---

[32] Steven H., 233 Wis. 2d 344, ¶¶31, 35.

[33] See Kenosha Cnty. v. Jodie W., 2006 WI 93, ¶8, 293 Wis. 2d 530, 716 N.W.2d 845.

[34] Majority op., ¶17 n.8.

14

v. Julie A.B., 2002 WI 95, ¶22, 255 Wis. 2d 170, 648 N.W.2d 402 (internal quotation marks omitted). Diluting the notice received by parents of the grounds for termination of parental rights and the conditions for the child's return undermines the fairness and adequacy of termination of parental rights proceedings and may raise significant constitutional due process issues.

¶118 Fourth, the majority opinion's interpretation of Wis. Stat. § 48.415(2) ignores and violates accepted rules of statutory interpretation. The majority opinion states that "[o]ur standards for interpreting statutes are well-known and need not be repeated here."[35] It appears that the majority opinion's failure to state the rules resulted in the majority opinion's failure to apply them.

¶119 The majority opinion examines Wis. Stat. § 48.415(2), but essentially ignores the text of a related statute § 48.356(2). The majority opinion states that because this is a termination of parental rights case, "not a CHIPS case," only Wis. Stat. § 48.415(2) is relevant.[36] This conclusion ignores the fact that § 48.415(2) deals specifically with termination of parental rights actions based on CHIPS and cross-references "the notice required by [Wis. Stat. §] 48.356(2)."[37]

---

[35] Majority op., ¶15.

[36] Majority op., ¶17.

[37] Wis. Stat. § 48.415(2)(a)1.

¶120 In its plain-meaning analysis, the majority opinion overlooks the well-accepted rule that context is important to meaning, as is the structure of the statute in which the operative language appears. Statutory language is interpreted in the context in which it is used, as part of a whole; not in isolation, but in relation to the language of surrounding or closely related statutes.[38] Thus, the majority opinion errs in its statutory interpretation.

¶121 Furthermore, as we stated previously, the majority opinion dilutes the statutory notice requirements and may be treading on the constitutional rights of a parent. A statutory interpretation that does not raise constitutional issues is preferable to one that does.[39]

¶122 Fifth and finally, the majority opinion is misleading when it states it is "clarifying" Steven H. by interpreting Steven H. to be limited to its facts.[40] The "unequivocal" holding of Steven H. is not limited to its facts. Steven H. expressly applies to termination of parental rights cases based on continuing CHIPS. The Steven H. court states:

> We conclude that Wis. Stat. §§ 48.356(2) and 48.415(2) require that the last order specified in § 48.356(2) placing a child outside the home, which must be issued

---

[38] See Noffke ex rel. Swenson v. Bakke, 2009 WI 10, ¶11, 315 Wis. 2d 350, 760 N.W.2d 156.

[39] See Jankowski v. Milwaukee Cnty., 104 Wis. 2d 431, 439, 312 N.W.2d 45 (1981) ("'[S]tatutes should be construed so as to avoid constitutional objections.'") (quoting Niagara of Wis. Paper Corp. v. DNR, 84 Wis. 2d 32, 50, 268 N.W.2d 153 (1978)).

[40] See majority op., ¶4.

at least six months before the filing of the petition
to terminate parental rights, must contain the written
notice prescribed by § 48.356(2).

Steven H., 233 Wis. 2d 344, ¶3; see also Steven H., ¶31.

¶123 The majority opinion explicitly withdraws this holding
of Steven H.,[41] ostensibly to "clarify" that Steven H. applied
only to its facts. But Steven H. unequivocally adopted a "last
order" notice rule for termination of parental rights cases
based on continuing CHIPS. Steven H. did not limit its holding
to the precise facts and circumstances of that case.

¶124 Thus, the majority opinion's adoption of the "at least
one order" notice rule departs from precedent. And no
sufficient justification is provided for this departure.[42]
Adhering to precedent is "the preferred course [of judicial
action] because it promotes evenhanded, predictable, and
consistent development of legal principles . . . and contributes
to the actual and perceived integrity of the judicial process."[43]

¶125 "This court is more likely to overturn a prior
decision when one or more of the following circumstances is
present: (1) Changes or developments in the law have undermined
the rationale behind a decision; (2) there is a need to make a
decision correspond to newly ascertained facts; (3) there is a
showing that the precedent has become detrimental to the

---

[41] See majority op., ¶¶4 & nn.3-4, 17.

[42] Bartholomew, 293 Wis. 2d 38, ¶32 (citations omitted).

[43] State v. Luedtke, 2015 WI 42, ¶40, 362 Wis. 2d 1, 863
N.W.2d 592 (quoting State v. Ferron, 219 Wis. 2d 481, 504, 579
N.W.2d 654 (1998)).

17

coherence and consistency in the law; (4) the prior decision is 'unsound in principle'; or (5) the prior decision is "unworkable in practice.'"[44]

¶126 The majority opinion does not state which, if any, of these circumstances justifies its departure from precedent in the instant case. The answer in the instant case is none.

¶127 No changes or developments in the law have occurred. No newly ascertained facts undermine the court's unanimous decision in Steven H.

¶128 To the contrary, subsequent circumstances bolster the unanimous holding in Steven H. Since Steven H. was decided in 2000, the legislature has amended Wis. Stat. § 48.415 nine times and Wis. Stat. § 48.356 twice.[45] By amending both statutes without removing the conflicting language or otherwise disturbing the "last order" notice rule in Steven H., the legislature "accepted and ratified" our holding.[46]

---

[44] Bartholomew, 293 Wis. 2d 38, ¶33.

[45] See 2011 Wis. Act 271; 2011 Wis. Act 257; 2009 Wis. Act 185; 2009 Wis. Act 94; 2007 Wis. Act 116; 2007 Wis. Act 45; 2005 Wis. Act 293; 2005 Wis. Act 277; 2003 Wis. Act 321; 2001 Wis. Act 109; 2001 Wis. Act 2.

[46] See Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2520 (2015) ("Congress' decision . . . to amend the FHA while still adhering to the operative language . . . is convincing support for the conclusion that Congress accepted and ratified the unanimous holdings of the Court of appeals . . . ."); see also Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 322 (2009) ("If a word or phrase has been authoritatively interpreted by the highest court in a jurisdiction . . . a later version of that act perpetuating the wording is presumed to carry forward that interpretation.").

18

¶129 The majority opinion does not argue that the court's unanimous decision in Steven H. is detrimental to the coherence or consistency of the law or that it is unworkable. Contrary to the majority opinion's suggestion, the court of appeals has all but universally followed Steven H.'s "last order" notice rule.

¶130 At best, the majority opinion's sole justification for its departure from precedent is that Steven H. is unsound in principle because it does not "apply the statutory words chosen by the legislature."[47] Wrong! Steven H. applied the accepted rules of statutory interpretation.

¶131 As we explained more fully above (and as the Steven H. court unanimously concluded), the statutory words chosen by the legislature are inconsistent. Wisconsin Stat. § 48.356(2) requires that notice accompany "any written order" placing the child outside the home. Wisconsin Stat. § 48.415(2) requires notice in "one or more court orders under s. 48.345, 48.347, 48.357, 48.363, 48.365, 938.345, 938.357, 938.363, or 938.365 containing the notice required by s. 48.356(2) . . . ."

¶132 The majority opinion tries to escape this inconsistency by arguing that because the instant case is a termination of parental rights case, we must apply only Wis. Stat. § 48.415(2). However, this termination of parental rights action is based on continuing CHIPS. Under Wis. Stat. § 48.356(2), any written CHIPS order placing a child outside the home must contain written notice of the grounds for termination

---

[47] See majority op., ¶25.

19

of parental rights and the conditions for the return of the child. Moreover, Wis. Stat. § 48.415(2) explicitly refers to "the notice required by s. 48.356(2)," and Wis. Stat. § 48.356(2) requires notice in "any written order."

¶133 The question is: What, if anything, has changed since the court's unanimous decision in Steven H.? The answer is the membership of the court.

¶134 Four justices who have joined the court since our unanimous decision in Steven H. now simply disagree with Steven H. A change in membership of the court is not a sufficient justification for departing from precedent.[48] "When existing law is open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results."[49]

II

¶135 We turn now to the participation of a new member of the court in deciding the instant case. Justice Rebecca G. Bradley's concurring opinion in the instant case explains publicly, for the very first time, her decision to participate in (some, but not all) cases argued before she became a member of the court.

---

[48] See Johnson Controls, 264 Wis. 2d 60, ¶138 ("No change in the law is justified by 'a change in the membership of the court or a case with more egregious facts.'") (quoting Stevens, 181 Wis. 2d at 441-42 (Abrahamson, J., concurring)).

[49] Luedtke, 362 Wis. 2d 1, ¶40 (quoting Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266).

20

¶136 All the decisions (but one) in cases argued and tentatively decided before the new justice's appointment to the court have been released. This writing is to update the status of these cases and compare Justice Rebecca G. Bradley's public approach to the role of a new justice in deciding cases argued and pending on her appointment and the approach taken in the past in this court and in the United States Supreme Court regarding the role of a new justice.

¶137 Indeed, the United States Supreme Court is now addressing the implications of the recent death of Justice Antonin Scalia and the possibility that a new justice will be appointed to fill his seat. The eight United States Supreme Court justices are expected to follow the Court's past practice of setting selected cases for reargument to enable a new justice to participate in deciding these cases. The practice has been described previously and we summarize it below.[50]

---

[50] See New Richmond News v. City of New Richmond, 2015 WI 106, ¶24, 365 Wis. 2d 610, 875 N.W.2d 107 (Abrahamson, J., concurring) (describing the past practice of the United States Supreme Court following the resignation, retirement, or death of a member of the Court).

(continued)

21

¶138 The facts and circumstances of the change in membership of the court, the status of cases heard in September and October, and the issues raised by a new justice's joining the court has been set forth previously.[51]

¶139 The question of a new justice's participation in cases upon his or her appointment should, we hope, be approached by the court and the justices in a descriptive, analytical, and historical manner, free from divisiveness or offensive posturing, personal attacks, and false accusations.[52]

¶140 Engaging in or responding to such personal attacks and accusations neither sheds light on the inquiry before us nor promotes public trust and confidence in the court.

---

Media accounts following the recent death of Justice Antonin Scalia concur in the descriptions of the practice in the United States Supreme Court in prior separate writings on this issue. See Adam Liptak, Deadlocks and Rearguments: What's Ahead for the Supreme Court, N.Y. Times (Feb. 18, 2016) ("**Q.** *Would a new justice be able to vote on cases argued before he or she was confirmed?* **A.** No. Cases in which the current justices were deadlocked, 4 to 4, would require rearguments to allow a new justice to participate.") (emphasis added); Adam Liptak, Scalia's Absence Is Likely to Alter Court's Major Decisions This Term, N.Y. Times (Feb. 14, 2016); see also Tom Goldstein, Tie votes will lead to reargument, not affirmance, SCOTUSblog (Feb. 14, 2016, 3:14 PM), http://www.scotusblog.com/2016/02/tie-votes-will-lead-to-reargument-not-affirmance/.

[51] See New Richmond, 365 Wis. 2d 610, ¶7 (Abrahamson, J., concurring); State v. Matalonis, 2016 WI 7, ¶70, 366 Wis. 2d 443, 875 N.W.2d 567 (Abrahamson, J., dissenting) (quoting New Richmond, 365 Wis. 2d 610, ¶7).

[52] The election for Justice Rebecca G. Bradley's seat was held on Tuesday, April 5, 2016.

22

¶141 To summarize the historical facts briefly, Justice N. Patrick Crooks passed away on September 21, 2015. Justice Rebecca G. Bradley joined the court on October 9, 2015. During the period between September 8, 2015, and October 9, 2015, when Justice Rebecca G. Bradley was not a member of the court, the court heard oral argument and tentatively decided sixteen cases. See Supreme Court Internal Operating Procedure II.E.[53]

---

[53] It was announced at oral arguments on September 17, 2015, and September 18, 2015, that Justice N. Patrick Crooks would not be attending oral arguments in the six cases argued and tentatively decided on those dates (including the instant case). It was announced that Justice N. Patrick Crooks would participate in these cases by watching oral arguments on WisconsinEye and discussing the cases in conference via telephone.

Thus counsel were aware of the nature of Justice N. Patrick Crooks' participation in the cases argued on September 17, 2015 and September 18, 2015. Counsel did not object.

There is precedent in this court for a member of the court to do as Justice Crooks explained he would do. There is also precedent in this court for a member of the court who has not attended oral argument to decline to participate in deciding the case.

In contrast, counsel did not know that Justice Rebecca G. Bradley, who was appointed to the court after oral argument, would be participating in the cases heard and tentatively decided prior to her appointment. Until the decisions were released, counsel had no opportunity to ask for reargument with Justice Rebecca G. Bradley present or to object to Justice Rebecca G. Bradley's participation without reargument.

¶142 In 12 of these cases, Justice Rebecca G. Bradley did not participate in the decision of the court.[54] In one of these cases, a case before this court on bypass from the court of appeals, New Richmond News v. City of New Richmond, 2015 WI 106, ¶1, 365 Wis. 2d 610, 875 N.W.2d 107, the court's per curiam decision explained the new justice's non-participation as follows: "The court is equally divided on whether to affirm or reverse the judgment of the circuit court for St. Croix County. This case was argued before the full court; however, Justice N. Patrick Crooks passed away prior to the court's decision. Justice Rebecca G. Bradley was appointed to the court after the court's decision, and therefore did not participate."[55]

---

[54] See In re Marriage of Meister, 2016 WI 22, ¶49, ___ Wis. 2d ___, 876 N.W.2d 746; State v. Smith, 2016 WI 23, ¶59, ___ Wis. 2d ___, ___ N.W.2d ___; United Food & Commercial Workers Union v. Hormel Foods Corp., 2016 WI 13, ¶107, 367 Wis. 2d 131, 876 N.W.2d 99; Wis. Pharmacal Co., LLC v. Neb. Cultures of Cal., Inc., 2016 WI 14, ¶86, 367 Wis. 2d 221, 876 N.W.2d 72; Burgraff v. Menard, Inc., 2016 WI 11, ¶81, 367 Wis. 2d 50, 875 N.W.2d 596; Hoffer Props., LLC v. DOT, 2016 WI 5, ¶48, 366 Wis. 2d 372, 874 N.W.2d 533; State v. Valadez, 2016 WI 4, ¶56, 366 Wis. 2d 332, 874 N.W.2d 514; State v. Dumstrey, 2016 WI 3, ¶52, 366 Wis. 2d 64, 873 N.W.2d 502; Winnebago Cnty. v. Christopher S., 2016 WI 1, ¶58, 366 Wis. 2d 1, ___ N.W.2d ___; Wis. Dep't of Justice v. Wis. Dep't of Workforce Dev., 2015 WI 114, ¶60, 365 Wis. 2d 694, 875 N.W.2d 545; New Richmond News, 365 Wis. 2d 610, ¶4; State v. Iverson, 2015 WI 101, ¶62, 365 Wis. 2d 302, 871 N.W.2d 661.

[55] New Richmond, 365 Wis. 2d 610, ¶1. The per curiam opinion went on to explain that Justice Shirley S. Abrahamson, Justice Ann Walsh Bradley, and Justice David T. Prosser would affirm. Chief Justice Patience Drake Roggensack, Justice Annette Kingsland Ziegler, and Justice Michael Gableman would reverse.

24

¶143 In three of these cases (including the instant case), Justice Rebecca G. Bradley participated in the decisions.[56]

¶144 One of these three cases in which Justice Rebecca G. Bradley participated, namely State v. Matalonis, 2016 WI 7, 366 Wis. 2d 443, 875 N.W.2d 567, was a 4-3 decision overturning the decision of the court of appeals. A motion for reconsideration was filed alleging that Justice Rebecca G. Bradley's participation violated the defendant's equal protection and due process rights. The motion was denied.

¶145 In two of the cases in which Justice Rebecca G. Bradley participated, namely the instant case and State v. Parisi, 2016 WI 10, 367 Wis. 2d 1, 875 N.W.2d 619, the final vote in each of the two cases was 5-2. Thus, the instant case and Parisi present different fact situations than Matalonis, in which Justice Rebecca G. Bradley appears to have cast the deciding vote, and New Richmond, a bypass case in which the justices were evenly divided without Justice Rebecca G. Bradley's participation.

¶146 In prior writings reviewing the experiences and practices of this court and the United States Supreme Court, when a new justice joins the court, the conclusion was as follows: A new justice who did not participate in oral argument

---

[56] The other two cases are State v. Parisi, 2016 WI 10, 367 Wis. 2d 1, 875 N.W.2d 619; and State v. Matalonis, 2016 WI 7, 366 Wis. 2d 443, 875 N.W.2d 567.

A decision in one case (argued, like the instant case, on September 17, 2015) has not yet been released: State v. LeMere, No. 2013AP2433-CR.

25

does not participate in the decision of the case unless the other members of the court decide that the case should be reargued.[57] The new justice may participate in reargument.

¶147 Taking a different and contrasting approach to this prior precedent, Justice Rebecca G. Bradley explains in her concurrence in the instant case that the new justice alone, not the court, decides whether the new justice will participate in a case that has been argued and tentatively decided before the new justice joined the court.

¶148 Justice Rebecca G. Bradley's public explanation of whether she will participate in cases argued but not decided before her appointment to the court and her explanation for her decision to avoid reargument are useful and important information for the bench, bar, and public. It sets a new precedent that informs and guides future practices of this court. In sum, it is beneficial to finally have Justice Rebecca Bradley's public explanation in writing as part of the court's record.

\* \* \* \*

¶149 We conclude that the majority opinion, without special justification, departs from a unanimous, workable, and settled precedent of this court, Waukesha County v. Steven H., 2000 WI

---

[57] Audio recordings of oral arguments in this court have been available for many years. Likewise, audio recordings of oral arguments in the United States Supreme Court have been available since 1955. See Oyez, http://www.oyez.org/about ("[Oyez] is a complete and authoritative source for all of the Court's audio since the installation of a recording system in October 1955.").

28, 233 Wis. 2d 344, 607 N.W.2d 607, and unjustly terminates the parental rights of Juanita A., a single mother with cognitive difficulties, to her son, Matthew D. In so doing, the majority opinion withdraws language in Steven H. adopting the "last order" notice rule and replaces it with an "at least one order" notice rule.[58]

¶150 The majority opinion provides no "special" justification for departing from precedent. The only change since Steven H. is in the membership of this court.

¶151 For the reasons set forth, we dissent and write separately.

---

[58] See majority op., ¶17.

1